UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

IIG GLOBAL TRADE FINANCE
FUND, LTD. *et al.*,

                    Debtors.

SAN AGUSTIN ENERGY CORP.,

                    Appellant,

            *– against –*

IIG GLOBAL TRADE FINANCE
FUND LTD. *and* IIG STRUCTURED
TRADE FINANCE FUND LTD.,

                    Appellees.

**OPINION & ORDER**

23-cv-4350 (ER)

23-cv-6611 (ER)

RAMOS, D.J.:

        San Agustin Energy Corp. ("San Agustin") appeals from an April 27, 2023 order

entered by United States Bankruptcy Judge Michael E. Wiles.  The order granted

summary judgment in favor of IIG Global Trade Finance Fund Ltd. ("Global Trade") and

IIG Structured Trade Finance Fund Ltd. ("Structured Trade") and denied summary

judgment in favor of San Agustin in an adversary proceeding between the parties.  Bankr.

Docs. 81, 82.[1]  The sole issue on appeal is whether the Bankruptcy Court erred in finding

that the parties entered into an enforceable agreement pursuant to which San Agustin

---

[1] References to "Bankr. Doc." relate to documents filed in the underlying bankruptcy proceeding, *In re IIG Global Trade Finance Fund Ltd. et al.*, No. 21-01092 (MEW).  References to "Doc." relate to documents filed in the instant appeal.

assumed all obligations for the borrowers of certain outstanding loans.[2]  For the reasons set forth below, the judgment of the Bankruptcy Court is AFFIRMED.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  *The Parties*

San Agustin is a Panamanian corporation.  Doc. 7-3 ¶ 11.  Global Trade and Structured Trade are limited liability companies incorporated in the Cayman Islands.  *Id*. ¶ 10.  Global Trade and Structured Trade are in official liquidation before the Grand Court of the Cayman Islands.  *Id*.  On appeal, the parties do not dispute that Global Trade and Structured Trade are the assignees of an entity called Trade Financial Trust ("TFT"). Bankr. Doc. 81 (hereinafter "Bankruptcy Op.") at 29–31.

#### 2.  *The March 2014 Loan Agreement*

At some date before March 2014, non-party Valle Energy Inc. ("Valle") negotiated the acquisition of certain oil fields in Colombia from non-party Pacific Stratus. Doc. 7-34 ¶¶ 1–5.  Valle and Pacific Stratus initially planned for Valle to acquire these oil fields through Valle's subsidiaries, but Colombian regulatory authorities would not approve that transaction because they determined that the subsidiaries did not have sufficient operating histories.  *Id.* ¶¶ 6–8.  As a result, Valle and Pacific Stratus modified their transaction so Pacific Stratus would transfer the oil fields to its indirect subsidiary, San Agustin San (which was then known as Las Quinchas Resources Corporation"),[3] after which Valle would acquire ownership of San Agustin.  *Id.* ¶ 9.

---

[2] The Statement of Issues on Appeal included another issue, whether the Bankruptcy Court erred in in the amount of damages it awarded to Global Trade and Structured Trade in the underlying adversary action. Doc. 4 at 2.  San Agustin has since clarified it is not pursuing this issue on appeal.  Doc. 7 at 9 n.1.

[3] Las Quinchas Resources Corporation changed its name to the San Agustin Energy Corporation on November 16, 2018.  Doc. 7-34 ¶ 71.  For ease of reference, Las Quinchas Resources Corporation will be referred to herein as San Agustin.

To finance its acquisition of the oil fields, on March 10, 2014, Valle and one of its subsidiaries, Lakeview Green Corp. ("Lakeview") entered into a loan agreement (the "March 2014 Loan Agreement") with IIG Capital, LLC ("IIG Capital), which acted as an agent for a lender. Doc. 7-9 at 1. While the March 2014 Loan Agreement did not name the lender for whom IIG Capital was acting as an agent, the parties do not dispute that the lender was Trade Finance Funding I, Ltd. ("TFFI"). Doc. 7-34 ¶ 18.

The March 2014 Loan Agreement provided Valle with a line of credit of up to $10 million dollars and was originally scheduled to mature on September 15, 2015. Doc. 7-9 at 2, 5. Valle intended to repay the loan with proceeds from the sale of oil produced from the oil fields it was acquiring from Pacific Stratus. Doc. 7-34 ¶ 25. The March 2014 Loan Agreement permitted the lender to "at any time, assign or transfer all or part of its rights or obligations under this Agreement[.]" Doc. 7-9 ¶ 10.1. The Agreement also stated that it "shall be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto[.]" *Id*. ¶ 10.2. Finally, the March 2014 Loan Agreement contained an integration clause, which stated that "this agreement and the other credit documents represent the final agreement between the parties . . . and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten agreements between the parties." *Id*. ¶ 10.23.

Also on March 10, 2014, San Agustin executed a conditional guaranty agreement in which it "guarantee[d] to [TFFI] the prompt payment in full when due . . . of the principal of and interest on the Loans . . . ." Doc.7-4 § 2.1. The conditional guarantee states that the agreement's effective date "means the first date on which Valle Energy Inc. controls (directly or indirectly) [San Agustin]." *Id*. § 1.

On July 25, 2014, Valle and Lakeview, as borrowers, and IIG Capital, as agent, executed the first amendment to the March 2014 Loan Agreement (the "First Amendment"). Doc 7-11. The First Amendment increased the borrowing limit to $16.5

million dollars.  *Id*. at 1.  In this document, San Agustin reaffirmed its obligations under the conditional guaranty.  *Id*. at 16–17.

On October 20, 2014, Valle, Lakeview, and IIG Capital executed a second amendment to the March 2014 Loan Agreement, which extended the maturity date of the loan to September 29, 2015 (the "Second Amendment").  Doc 7-12.  Again, San Agustin reaffirmed its obligations under the conditional guaranty.  *Id*. at 13.

On December 23, 2014, Valle, Lakeview, and IIG Capital executed a third amendment to the March 2014 Loan Agreement, which provided that the principal installment of the loan that Valle and Lakeview previously repaid could be re-borrowed (the "Third Amendment").  Doc. 7-13.  San Agustin again reaffirmed its obligations under the conditional guaranty.  *Id* at 6; Doc. 7-34 at ¶ 58.[4]

On October 30, 2015, Valle, Lakeview, and IIG Capital executed a fourth amendment to the March 2014 Loan Agreement, which extended the maturity date of the loan to October 31, 2016 (the "Fourth Amendment").  Doc. 7-14.  Valle and Lakeview affirmed that they owed $16.5 million dollars in principal and $175,885 in accrued interest pursuant to the March 2014 Loan Agreement.  *Id*. at 12.[5]

On November 20, 2015, Valle acquired all of the shares of San Agustin's immediate parent company, making San Agustin an indirect wholly-owned subsidiary of Valle.  Doc. 7-34 ¶¶ 12–13.  Accordingly, on November 20, 2015, the conditions as to the effective date of San Agustin's conditional guarantee were satisfied, making San Agustin a guarantor of Valle and Lakeview's loan.  *See* Doc. 7-34 ¶¶ 10–17; Bankruptcy Op. at 6.  The loan matured on October 31, 2016 without payment from Valle or Lakeview.  Doc. 7-34 ¶¶ 131–133.

---

[4] The reaffirmations attached to the Third Amendment do not specify what entity was signing which reaffirmation.  However, the parties do not dispute the fact that San Agustin signed a reaffirmation of its obligations pursuant to the conditional guaranty.

[5] The parties do not allege, and the record does not reflect, that San Agustin reaffirmed its obligations under the conditional guaranty with regard to the Fourth Amendment.

### 3. The December 2015 Loan Agreement

Separate from the March 2014 Loan Agreement, on December 3, 2015, Valle entered into a loan agreement ("the December 2015 Loan Agreement") with another entity associated with IIG Capital, IIG TOF B.V. ("IIG TOF").  *See* Doc. 7-15.  Unlike in the March 2014 Loan Agreement, IIG TOF served as the direct lender rather than through an agent, and under the express contract terms was allowed to assign its rights at any time and/or to sell participation interests in any outstanding loans.  *Id*. at 34.  The December 2015 Loan Agreement allowed Valle to borrow up to $4 million dollars, and was scheduled to mature on June 30, 2017.  *Id*. at 6.  Valle did not repay the loan by that date.  Bankruptcy Op. 7.

### 4. The Parties' Negotiations and the Fifth Amendment

In the meantime, instead of pursuing default remedies after the loans were not repaid, in October 2016, the parties began discussing possible amendments to both loan agreements.  While they never formalized an agreement, these discussions were memorialized in an initial terms sheet dated October 20, 2016.  Doc. 7-34 ¶ 73.  On June 6, 2017, TFFI sold its right, title, and interest to the March 2014 Loan Agreement to TFT.  Doc. 7-34 ¶ 103.  The parties circulated a second terms sheet on August 8, 2017 and a third terms sheet on August 11, 2017.  *Id*. ¶¶ 74–75.  In August 2017, TFT acquired IIG TOF's rights pursuant to the December 2015 Loan Agreement.  *Id*. ¶ 103.  Accordingly, by September 2017, TFT was the lender on both the March 2014 and December 2015 Loan Agreements.  From 2017 to 2019, the parties operated under the term sheets, even though the amended loan documents were not yet executed.  *Id*. ¶¶ 100–101.

During the month of September 2019, San Agustin and TFT discussed a possible fifth amendment to consolidate the March 2014 and December 2015 Loan Agreements ("the Fifth Amendment").  Docs. 7-38, 7-50.  On September 19, 2019, Nathalia Torres, an attorney for San Agustin, forwarded TFT copies of minutes from the boards of directors

of San Agustin and San Agustin's parent corporation, each authorizing the execution of the Fifth Amendment.  Docs. 7-50, 7-51.

On October 15, 2019 a representative of TFT emailed a representative of San Agustin a copy of the Fifth Amendment executed on the same date by TFT.  Doc. 7-17. On November 1, 2019, a representative of San Agustin emailed a representative of TFT a copy of the Fifth Amendment, which San Agustin had revised in certain respects, executed by San Agustin on October 28, 2019.  Doc. 7-19.  San Agustin forwarded its copy of the Fifth Amendment along with a cover email that stated:

> I attach the [F]ifth [A]mendment, signed and authenticated by [the CEO of San Agustin, Sergio Abauat Calderon].  Nathalia [Torres] is preparing the package to send it to IIG in New York.  However, as the maturity date agreed is immediate, and the company cannot cancel the amount of the credit, therefore, this will be immediately put in breach.  In this situation, we insist that IIG approves [*sic*] a six-month extension, or longer, that we requested in previous days to cancel the credit, an extension that may be included in the text of the [F]ifth [A]mendment.

Doc. 7-18 (the "November 1, 2019 cover email").  The parties agree that the version of the Fifth Amendment that was executed by TFT and the version that was subsequently executed by San Agustin are identical, except in the following respects:

- The version executed by TFT bears the words "Execution Copy" on the top right corner of each page;
- The version executed by TFT states that is it dated "as of October 15, 2019," whereas the version executed by San Agustin states that it is dated "as of October 28th, 2019;" and
- The definition of "Fifth Amendment" on page 4 refers to an amendment dated as of October 15, 2019 in the TFT version, and refers to an amendment dated as of October 28th, 2019 in the San Agustin version.

Bankruptcy Op. at 10.[6]  Paragraph 4 of each executed version that the parties exchanged was unchanged, and states that "[a]s of the date hereof, each of Valle and Lakeview hereby assigns to [San Agustin] . . . , and San Agustin hereby assumes from each of Valle

---

[6] The parties do not contest these differences on appeal.

6

and Lakeview, . . . all of the rights and obligations of Valle and Lakeview under the Loan

Agreements . . . ." Doc. 7-17 ¶ 4; Doc. 7-19 ¶ 4.  Paragraph 25 of each executed version

was also unchanged, and states:

> [San Agustin] represents and warrants to [TFT] that:  (a) it has full
> power and authority, and has taken all action necessary, to execute
> and deliver this Fifth Amendment and all documents related hereto
> to which it is a party, and to perform its obligations hereunder and
> thereunder, including without limitation the assumption of the Loan
> in the amount of US $15,450,000 plus accrued interest thereon and
> the repayment; (b) this Fifth Amendment and each document related
> hereto to which it is a party has been duly executed and delivered by
> it and constitutes its legal, valid, and binding obligation, enforceable
> in accordance with its terms [. . . ].

Doc. 7-17 ¶ 25; Doc. 7-19 ¶ 25.  Paragraph 27 of each executed version of the Fifth

Amendment states that the Amendment "shall become effective as of the date of its

signature."  Doc. 7-17 ¶ 27; Doc. 7-19 ¶ 27.  Paragraph 27 also states that San Agustin

"will deliver to [TFT] . . . a new Note duly executed by San Agustin," "shall deliver"

officer certificates, and "shall execute and deliver" a pledge of stock as collateral.  *Id*.

Paragraph 29 of each executed version states that the agreement will be governed by New

York law.  Doc. 7-17 ¶ 29; Doc. 7-19 ¶ 29.  Paragraph 30 of each executed version states

that the Fifth Amendment "may be executed by the parties in several counterparts, each

of which shall be deemed to be an original and all of which shall constitute but one and

the same agreement."  Doc. 7-17 ¶ 30; Doc. 7-19 ¶ 30.  Additionally, each executed

version sets the interest rate on the loans to 11.5%, a reduction from the previously

governing 12.5% interest rate.   Doc. 7-17 ¶ 6; Doc. 7-19 ¶ 6; Doc. 7-48 at 62.  Each

executed version also provides that the loans' final maturity date would be on October 31,

2019.  Doc. 7-17 ¶ 8; Doc. 7-19 ¶ 8.  Finally, the Fifth Amendment states that the March

2014 Loan Agreement, "as amended hereby, is hereby ratified, approved, and confirmed

in each and every respect[.]"  Doc. 7-17 ¶ 28; Doc. 7-19 ¶ 28.

On November 20, 2019, San Agustin's counsel sent a signed, proposed modified

amendment (the Proposed Modified Fifth Amendment") to TFT, along with the signed

pledge agreement, executed promissory note, and the officers' certificates.  Doc. 7-34 ¶¶
90–95.  The Proposed Modified Agreement was identical to the versions of the Fifth
Amendment that San Agustin had previously executed on October 28, 2019, except that:

- this version of the amendment was dated as of November 19, 2019;
- the final maturity date was listed as April 30, 2020 rather than October 31, 2019;
- a comma was deleted in a reference to a fee payment not to exceed $20,000 (listing the amount as "twenty thousand dollars US $20.000" [*sic*] rather than "twenty thousand dollars US $20,000"); and
- a capital letter "T" was substituted for a lower case "t" in the phrase "the Lender" in section 27.

Bankruptcy Op. at 24.[7]  TFT did not sign the Proposed Modified Fifth Amendment.  Doc.
7-34 ¶ 96.  Accordingly, in the Proposed Modified Fifth Amendment, San Agustin, among
other, minor, revisions, purported to extend the maturity date by six months.

    5.  *The Bankruptcy Proceedings*

    On October 8, 2020, the Bankruptcy Court approved the assignment by TFT, to
Global Trade and Structured Trade, of TFT's "right, title [and] interest in" a series of
loans, including the $ 15,450,000 principal amount to "Valle Energy Inc."  that remained
outstanding pursuant to the Fifth Amendment.  Bankruptcy Op. at 21.

    On March 12, 2021, Global Trade and Structured Trade brought an adversary
proceeding against San Agustin in bankruptcy court to recover the unpaid loan
obligations, alleging, among other causes of action, that San Agustin breached its
payment obligations pursuant to the Fifth Amendment.  Bankr. Doc. 1.  Global Trade and
Structured Trade filed an amended complaint on July 8, 2021, which became the
operative complaint in the underlying action.  Bankr. Doc. 21.  On August 13, 2021, San
Agustin filed a motion to dismiss, Bankr. Doc. 26, which the Bankruptcy Court denied on
September 28, 2021.  Bankr. Doc. 39.  San Agustin answered the amended complaint on

---

[7] The parties do not contest these facts on appeal.

October 7, 2021.  Bankr. Doc. 40.  On June 30, 2022, San Agustin moved for summary judgment.  Bankr. Doc. 59.  Global Trade and Structured Trade cross-moved for summary judgment that same day.  Bankr. Doc. 60.  The Bankruptcy Court held oral argument on October 4, 2022.  Bankr. Doc. 72.  During oral argument, Global Trade and Structured Trade agreed that the effective date of the Fifth Amendment could be determined to be whatever most benefitted San Agustin,[8] and subsequently incorporated that concession into their damage calculations.  Bankruptcy Op. 24.

On April 27, 2023, the Bankruptcy Court issued its decision granting summary judgment to Global Trade and Structured Trade.  Bankruptcy Op.  The court found "the relevant facts are not in dispute, and that the Fifth Amendment was validly executed by the parties and is enforceable."  Bankruptcy Op. at 3.  Specifically, the Bankruptcy Court held that the minor differences between the versions of the Fifth Amendment executed by TFT and San Agustin were immaterial and did not affect its enforceability.  *Id*. at 22–25.  The Bankruptcy Court also found that the Fifth Amendment did not require the delivery of additional documents, including the promissory note, the officers' certificates, and the pledge agreement) as conditions to be met before the Fifth Amendment could be enforced.  *Id.* at 26–27.  It found that the Fifth Amendment was a binding contract, and that its effective date was October 28, 2019, when San Agustin countersigned it.  Bankruptcy Op. 24–25.  Separately from its contract analysis, the Bankruptcy Court also considered whether the November 1, 2019 cover email suggested San Agustin's intent not to be bound by the Fifth Amendment.  *Id.* at 25–26.  The Bankruptcy Court rejected this argument, reasoning that the cover email did not "express any doubt as to the enforceability or the binding nature" of the Fifth Amendment.  *Id*. at 25.  Additionally, the Bankruptcy Court found that since the Proposed Fifth Amendment's terms stated it would

---

[8] As San Agustin's counsel explained during oral argument in the proceedings before the Bankruptcy Court, the Fifth Amendment lowered the loans' interest rate from 12.5% to 11.5%, and therefore San Agustin would gain more "interest relief" if the effective date was October 15, 2019.  Doc. 7-48 at 62.

only be effective upon its signature, and because TFT never signed the agreement, the Proposed Fifth Amendment never went into effect.  *Id.* at 35.

### B.  Procedural History

San Agustin filed its Notice of Appeal on May 11, 2023.  Doc. 1.  On July 21, 2023, San Agustin filed a Notice of Appeal of an amended judgment entered by the Bankruptcy Court in the underlying matter, which was docketed as a separate appeal.  *See In Re: IIG Global Trade Finance Fund Ltd.*, No. 23-cv-6611 (the "Amended Judgment Docket.").  In its Related Case Statement, San Agustin explains that the amended judgment adds costs and fees, but is otherwise the same as the original judgment, and that "San Agustin appeals the [a[mended [j]udgment in an abundance of caution to clarify that it is not waiving its rights under the appeal of the [o]riginal [j]udgment."  Amended Judgment Docket Doc. 3 at 2.  On August 1, 2023, the Court accepted the case as related to No. 23-cv-4350.  With the consent of Global Trade and Structured Trade, San Agustin moved to consolidate the two cases, a request which the Court granted on August 16, 2023.  Doc. 9.

## II.   LEGAL STANDARD

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in relevant part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges."  §§ 158(a)(1), (3).

A district court generally reviews the findings of fact of a bankruptcy court under a "clearly erroneous" standard, but conclusions of law are reviewed *de novo*.  *See, e.g., In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988–89 (2d Cir. 1990); *Nova v. Premier Operations, Ltd. (In re Premier Operations)*, 294 B.R. 213, 217 (S.D.N.Y. 2003).

Here, the Court has under review a bankruptcy court's ruling on a motion for summary judgment.  Federal Rule of Civil Procedure 56 is applicable to these

proceedings pursuant to Federal Rules of Bankruptcy Procedure 7056.  Fed. R. Bankr. P.

7056.  Pursuant to Rule 56, Summary judgment is appropriate where "the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011)

(citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact

is "material" if it might "affect the outcome of the litigation under the governing law."

*Id.* (quoting *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party

moving for summary judgment is first responsible for demonstrating the absence of any

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the

moving party meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid

summary judgment." *Saenger v. Montefiore Medical Ctr.*, 706 F. Supp. 2d 494, 504

(S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir.

2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in

the light most favorable to the non-moving party and must resolve all ambiguities and

draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156,

164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir.

2004)).  However, in opposing a motion for summary judgment, the non-moving party

may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of

Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must

do more than show that there is "some metaphysical doubt as to the material facts."

*McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotations omitted).  To

defeat a motion for summary judgment, "the non-moving party must set forth significant,

probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*,

812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

## III.   DISCUSSION

The parties dispute whether the Fifth Amendment is a binding and enforceable agreement, in light of the textual differences between the October 15, 2019 version signed by TFT and the October 28, 2019 version signed by San Agustin.  As a preliminary matter, the parties agree this is a legal issue that the Court reviews on a *de novo* standard.  Doc. 7 at 10, Doc. 8 at 2.

> a.  *There are no Material Differences Between the Executed Versions of the Fifth Amendment*

San Agustin argues that the Fifth Amendment is not valid because the parties executed materially different versions.  Doc. 7 at 27–32, and therefore did not mutually assent to be bound by the agreement.  Doc. 7 at 21.  Global Trade and Structured Trade respond that the Bankruptcy Court correctly determined that the Fifth Amendment is valid because any minor textual differences between October 15, 2019 and the October 28, 2019 versions are immaterial.  Doc. 8 at 8–11.

To form a valid contract under New York law,[9] there must be a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589, 715 N.E.2d 1050, 1053 (1999).  This requirement allows courts to "give teeth to the parties' mutually agreed terms and conditions" when one party seeks to uphold the agreement against the other.  *Id.*  In other words, "the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty."  *Marcus v. Lominy*, No.18-cv-1857 (NSR), 2022 WL

---

[9] The Fifth Amendment includes an express New York choice-of-law provision, and the parties do not dispute the applicability of New York state contract law to this case either here or in the underlying bankruptcy proceeding.  *See* Bankruptcy Op. at 22*; see also Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc.*, 948 F. Supp. 1227, 1233 n.14 (S.D.N.Y. 1996) (applying New York law where the parties briefed the case on that basis and there was no suggestion that another state's law should apply).

493688, at *8 (S.D.N.Y. Feb. 17, 2022) (internal quotations and citations omitted). Conversely, "[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Hudson & Broad, Inc. v. J.C. Penney Corp.*, 553 F. App'x 37, 39 (2d Cir. 2014).

A "material term" in a contract is "[a] contractual provision dealing with a significant legal issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015); *see e.g.*, *Local 917, Intern. Broth. of Teamsters v. N.L.R.B.*, 577 F.3d 70, 74 (2d Cir. 2009) (material terms include, but are not limited to, "price, quantity, and the means by which the product is delivered") (citations omitted).  In other words, material terms "seriously affect[] the rights and obligations of the parties[.]" *Dreyfuss v. eTelecare Glob. Sols.-US, Inc.*, No. 08-cv-1115 (RJS), 2008 WL 4974864, at *4 (S.D.N.Y. Nov. 19, 2008), *aff'd sub nom. Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551 (2d Cir. 2009).[10]

Here, there is no dispute that the parties signed the Fifth Amendment on different days and that there are differences between the October 15, 2019 and October 28, 2019 versions.  However, these differences only matter if they are material, or in other words, affect the parties' rights and obligations pursuant to the contract.  *See Morelli v. Alters*, No. 19-cv-10707 (GHW), 2020 WL 1285513, at *9 (S.D.N.Y. Mar. 18, 2020).

San Agustin first alleges that the different "as of" dates in the versions executed by the parties results in different effective dates of the agreement, which constitutes a material difference because it affects the calculation of interest due on the outstanding loans.  Doc. 7 at 29–32.  Relatedly, San Agustin argues that the different "as of" dates render the Fifth Amendment ambiguous as to its start date.  Doc. 11 at 10–11.  These

---

[10] While the *Dreyfuss* opinion references "essential" terms, this is the same concept as "material terms." *See Shann v. Dunk*, 84 F.3d 73, 78 (2d Cir. 1996) (noting trend of New York state court decisions referring to the "absence or presence of 'material' terms in determining whether a contract is enforceable," while the Second Circuit has "traditionally spoken of whether it contained all the necessary 'essential' terms.").

arguments are without merit, because each version of the Fifth Amendment expressly identifies the effective date as the "date of its signature."  Doc. 7-17 ¶ 27; Doc. 7-19 ¶ 27. Accordingly, the effective date of the Agreement is October 28, 2019, the date by which it was fully executed by both parties.[11]

Indeed, New York state courts have found that immaterial differences like changed dates that do not affect the parties' liabilities do not impact the validity of a contract.  *See Phalanx Corp. v. Philite Radiant, Inc.*, 19 A.D.2d 515, 240 N.Y.S.2d 33 (1963) (insertion of date subsequent to execution was an immaterial alteration because it did not increase the liability of the defendant).  And while San Agustin argues that the effective date is material because it affects its ultimate financial liability, this argument is mitigated by the fact that, in the proceedings below, Global Trade and Structured Trade agreed the effective date of the Fifth Amendment could be "determined to be whatever signature date would most benefit San Agustin" and incorporated that figure into their damages calculations.  Bankruptcy Op. at 24.  Accordingly, the different "as of" dates are not material differences.

Second, San Agustin argues that the Bankruptcy Court's decision changed the contractual meaning of effective date from "as the date of its signature" to "as the last date it was signed by the parties.  Doc. 7 at 31.  This argument implies that the parties intended for the Fifth Amendment to be signed on the same day, but the Fifth Amendment contains no such requirement.  Additionally, San Agustin never explains why such a change would constitute a material difference.

Third, even assuming the differences between the two versions of the Fifth Amendment are immaterial, San Agustin contends that because the Fifth Amendment only contemplated counterparts to be signed if they were exactly identical, even minor

---

[11] San Agustin also mentions that the Bankruptcy Court's ruling "effectively renders superfluous the definition of the 'Fifth Amendment' in the October 15 [2019] draft."  Doc. 7 at 32.  San Agustin does not explain why this is so, or how it affects any material term.

differences between the versions are sufficient to prevent the agreement from being enforced. Doc. 7 at 27–29. To support its argument, San Agustin cites to Black's Law Dictionary and a source from the Cornell Law School Legal Information Institute that define a counterpart as a duplicate or copy. *Id*. at 28. However, the mere definition of a counterpart does not support San Agustin's claim that in order to be valid, counterparts must be identical. This is especially true when San Agustin offers no caselaw to support its theory.

Moreover, courts have often held that immaterial differences between a contract offer and contract acceptance still bind the parties to an enforceable contract. *See, e.g.*, *In re Randall's Island Family Golf Cntrs., Inc.,* 261 B.R. 96, 100 (Bankr. S.D.N.Y. 2001) ("'expressions of assent by an offeree, which contain immaterial deviations from the original offer, do not constitute counter-offers but, rather, operate to bind the parties to an enforceable contract.'" (quoting *Knapp v. McFarland,* 344 F. Supp. 601, 613 (S.D.N.Y. 1971)); *see also Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71, 83 (2d Cir. 1998) ("If the acceptance of an offer is initially unconditional, the fact that it is accompanied with a direction or a request looking to the carrying out of its provisions, but which does not limit or restrict the contract, does not render it ineffectual or give it the character of a counteroffer.") (internal citations omitted). The Court agrees with the Bankruptcy Court that the immaterial changes made by San Agustin to the Fifth Amendment still resulted in a binding contract.

In sum, the Court upholds the Bankruptcy Court's judgment that there were no material differences between the October 15, 2019 and the October 28, 2019 versions of the Fifth Amendment.

   b.  *the Fifth Amendment was not Conditioned on the Delivery of Ancillary Documents*

San Agustin next argues that the Fifth Amendment never became effective because San Agustin failed to deliver the signed pledge agreement, executed promissory

note, and the officers' certificates described in the Fifth Amendment, and only turned those documents over to TFT in relation to the Modified Proposed Fifth Amendment. Doc. 7 at 35–39.  In contrast, Global Trade and Structured Trade represent that the Fifth Amendment had no conditions precedent to its becoming effective other than the parties' signature.  Doc. 8 at 11–14.

New York contract law recognizes that conditions precedent to contract formation are distinct from conditions precedent to performance.  Where a condition precedent to contract formation exists, "no contract arises unless and until the condition occurs." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690, 660 N.E.2d 415, 418 (1995) (internal citations omitted).  On the other hand, conditions precedent to performance "describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract."  *Id.*  If parties intend that a contractual provision is a condition precedent to contract formation, courts generally require the "unmistakable language of condition" such as "if," "unless," "until," "on the condition that" or "subject to."  *See generally id.*, 86 N.Y.2d at 691; *Georges v. United Nations*, 834 F.3d 88, 94 (2d Cir. 2016).  "Conditions precedent to most contractual obligations . . . are not favored and must be expressed in plain, unambiguous language." *Olin Holdings Ltd. v. State*, 73 F.4th 92, 103 (2d Cir. 2023) (internal quotations and citations omitted).

Here, both versions of the Fifth Amendment provide that San Agustin "will deliver" an executed note, "shall deliver" officer certificates, and "shall execute and deliver" a pledge of stock.  Doc. 7-17 ¶ 27; Doc. 7-19 ¶ 27.  The language of the Amendment does not include unmistakable words indicating that a condition precedent to contract formation exists.  *See Oppenheimer*, 86 N.Y.2d at 691; *Georges*, 834 F.3d at 94. And while San Agustin contends that "it would only be logical for the parties to agree that a pledge agreement to be signed so that the security interest in collateral can be perfected before the lender is bound," Doc. 7 at 35, the Court's role is to enforce the

agreement as written.  *See Vill. of Spring Valley v. Post Off. Square*, LLC, 211 A.D.3d

885, 888, 181 N.Y.S.3d 272, 275 (2022) ("It is the role of the courts to enforce the

agreement made by the parties—not to add, excise or distort the meaning of the terms

they chose to include hereby creating a new contract under the guise of construction.")

(internal citations and quotations omitted).  Accordingly, the Court agrees with the

Bankruptcy Court that the delivery of certain additional documents were not required

before the Fifth Amendment became effective.

     *c. Reference to Extrinsic Evidence is not Necessary*

     San Agustin separately contends that the Court should find, on the basis of

extrinsic evidence including the Proposed Modified Fifth Amendment and November 1,

2019 cover email, that the parties did not intend for the Fifth Amendment to be binding.

Doc. 7 at 39–42.[12]  Global Trade and Structured Trade argue that considering extrinsic

evidence is not warranted because the Fifth Amendment is unambiguous, and even if

considered, that any extrinsic evidence does not show a lack of intent to be bound.  Doc.

8 at 14–18.

     "[E]xtrinsic evidence may not be considered unless the document itself is

ambiguous."  *Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d

403, 950 N.Y.S.2d 8, 11 (2012) (internal citations and quotations omitted).  Whether a

contract is ambiguous is a question of law to be decided by the Court.  *Compagnie*

*Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith*

*Inc.*, 232 F.3d 153, 158 (2d Cir. 2000).  "A contract is unambiguous if the language it uses

has 'a definite and precise meaning, unattended by danger of misconception in the

purport of the [agreement] itself, and concerning which there is no reasonable basis for a

difference of opinion.'"  *Duane Reade*, 950 N.Y.S.2d at 11 (alteration in original)

(quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280,

---

[12] While the Bankruptcy Court did consider extrinsic evidence, it ultimately found that the evidence did not
change its conclusion that the Fifth Amendment was binding.  Bankruptcy Op. at 25–26, 35.

1282 (1978)).  Conversely, a contract is ambiguous where its language is susceptible to multiple reasonable interpretations.  *Brad H. v. City of New York*, 17 N.Y.3d 180, 186, 928 N.Y.S.2d 221, 951 N.E.2d 743 (N.Y. 2011).

To determine whether a contract is ambiguous, courts look "within the four corners of the document, not to outside sources[.]"  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 356, 696 N.E.2d 174 (1998).  Further, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a reasonable interpretation."  *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).  As such, a court should not find ambiguity where "the interpretation urged by one party would 'strain the contract language beyond its reasonable and ordinary meaning.'"  *Id*. (internal citations omitted).

San Agustin argues that the Fifth Amendment is ambiguous as to its effective date and whether the delivery of certain ancillary documents was a condition precedent to its becoming effective.  Doc. 7 at 32, 37; Doc. 11 at 10–11.  San Agustin's arguments are unavailing.  Again, as explained in more detail above, the plain language of the Fifth Amendment resolves these issues, and the Court considers extrinsic evidence of the parties' intent only where that plain language yields ambiguity.  *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002).

Next, San Agustin contends that extrinsic evidence is necessary to show that the parties lacked intent to be bound by the agreement.  Doc. 7 at 33–35, 38–42.  However, this inquiry would require the court to find, from the four corners of the agreement, that the agreement was ambiguous concerning the parties' intent to be bound.  *JA Apparel Corp. v. Abboud*, 568 F.3d at 396.  There is no reading of the Fifth Amendment that is reasonably susceptible to that reading.  Moreover, the "best evidence of what parties to a written agreement intend is what they say in their writing."  *Duane Reade*, 950 N.Y.S.2d

at 11; *see also 1125 Morris Ave. Realty LLC v. Title Issues Agency LLC*, 81 Misc. 3d 1215(A), 200 N.Y.S.3d 760 (N.Y. Sup. Ct. 2023) ("Ordinarily, the signer of a deed or other instrument, expressive of a jural act, is conclusively bound thereby.  That his mind never gave assent to the terms expressed is not material.") (internal citations omitted). Here, both parties signed the Fifth Amendment, which included language stating "this Fifth Amendment and each document related hereto to which it is a party has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable in accordance with its terms [. . . ]."  Doc. 7-17 ¶ 25; Doc. 7-19 ¶ 25.  Thus, San Agustin did intend to be bound by the Fifth Amendment, and its arguments to the contrary are unpersuasive.

Finally, San Agustin argues that there is an exception to the parol evidence rule that a party can always allege that an agreement did not go into effect.  Doc. 6 at 33, 39–40.  Under New York law, the parol evidence rule "bars the consideration of extrinsic evidence of the meaning of a complete written agreement if the terms of the agreement, considered in isolation, are clear and unambiguous."  *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc*., 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000).  "Various exceptions to that rule encompass the situation in which the validity of the instrument is attacked on the ground that the writing, although purporting to be a contract, is in fact no contract at all."  *Davis v. Davis*, 266 A.D.2d 867, 868, 697 N.Y.S.2d 888, 890 (1999). However, "it is generally understood that the purpose of an integration clause is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing."  *Bank of Am., Nat. Ass'n v. Wm. V. Schmidt Co*., No. 10-cv-4926 (NRB) 2011 WL 1334844, at *6 (S.D.N.Y. Mar. 25, 2011) (internal citations omitted).

First, the Court notes that San Agustin did not make arguments regarding an exception to the parol evidence rule in the underlying bankruptcy proceedings. Generally, a district court will not address arguments that were not presented to the

bankruptcy court. [13]  *See Universal Church v. Geltzer*, 463 F.3d 218, 228 (2d Cir. 2006);

*In re Salander*, 503 B.R. 559, 569 (S.D.N.Y. 2013) ("[I]ssues not raised in bankruptcy

court cannot be raised in first instance on appeal.").  But even on the merits, the Court

disagrees with San Agustin.  Here, the original March 2014 Loan Agreement included an

integration clause.  *See* Doc 7-9 ¶ 10.23.  The Fifth Amendment stated that the March

2014 Loan Agreement, "as amended hereby, is hereby ratified, approved, and confirmed

in every respect."  Doc. 7-19 at 13.  In other words, the Fifth Amendment reaffirmed and

restated the original integration clause.  Thus, the "integration clause prohibits the court

from considering any oral contract that was allegedly made prior to the written

agreement, since parol evidence to vary, contradict, or supplement the terms of a fully

integrated agreement is not admissible."  *Holloway v. King*, 161 Fed. Appx. 122, 124–25

(2d Cir. 2005) (internal citations omitted).  Accordingly, the parol evidence rule fully

applies.  *Bank of Am., Nat. Ass'n*, 2011 WL 1334844.  And while San Agustin retorts

that—in spite of the integration clause—parol evidence can be considered when a

contract is ambiguous, Doc. 11 at 13, this consideration does not apply.  As explained in

more detail above, the Fifth Amendment's terms are unambiguous.

 In sum, the Court agrees with the Bankruptcy Court that the Fifth Amendment is

not ambiguous, and therefore finds that evaluating extrinsic evidence about the parties'

intent to be bound is not required.

---

[13] While this is the general rule, "arguments made on appeal need not be identical to those made below if
they involve only questions of law and additional findings of fact are not required."  *In re Salander*, 503
B.R. 559, 569 n.13 (S.D.N.Y. 2013).

**IV.    CONCLUSION**

For the reasons set forth above, the Order of the Bankruptcy Court is

AFFIRMED.   The Clerk of Court is respectfully directed to terminate the appeal in each

case, Doc. 1, and to close both cases.

It is SO ORDERED.

Dated:    March 15 2024
              New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.